UTICA,
Aug. 1824.
Chichester
v.
Cande.

---

CHICHESTER and VAN WYCK *against* CANDE, impleaded
with LASHER.

SEVEN judgments had been obtained in the *Onondaga*
Common Pleas, against *Lasher* alone, to the amount of
ord was not filed ; then judgment and execution in favour of C against B
tions being levied on the same personal property, which was sold and the avails paid over,
by order of this court, in certain portions, to A and C, before the latter discovered that
A's judgment was imperfect. Then C, on discovering this, applies for a preference as to
the whole of the money. This was denied, and on A's application he was allowed to file
his record *nunc pro tunc,* it appearing that his execution was first levied, and C having
full notice of A's judgment, before his (C's) judgment was obtained.

Judgment and
execution by
A against B,
but by acci-
dent the rec-
Both execu-

$2725,19, a *fi. fa.* on each of which was delivered to the Sheriff of *Onondaga* on the 24*th September*, 1821. The following judgments were obtained in this Court, viz. one in favour of *Chichester* & *Van Wyck*, for $959,28, against *Lasher* & *Cande*, partners, on which a *fi. fa.* was delivered to the Sheriff of *Onondaga*, *Sept.* 27*th*, 1821—a judgment in favour of *Tredwell et al.* against *Cande* impleaded with *Lasher*, for $784,09—and another judgment in favour of *Humphrey* against *Cande* impleaded with *Lasher*, for $942.53. The two last judgments were also against the defendants as partners, and the *fi. fa.* in each was delivered to the Sheriff of *Onondaga*, *Oct.* 29*th*, 1821. On these executions the Sheriff levied on partnership property, and on his application to this Court for direction, in *January* term, 1822, he was ordered to sell the goods and bring the money into Court, which he did, to the amount of $1764,50. At *May* term, 1822, this Court directed that the execution in favour of *Chichester* & *Van Wyck*, be first satisfied, secondly the other two judgments in this Court, which had been assigned to *Russ*, and that the Common Pleas executions be postponed to these. The Sheriff accordingly paid to *Chichester* & *Van Wyck* $986,34, and $776,78 to *Russ*. *Russ*, on the last application to the Supreme Court, sought to obtain preference over *C.* & *V.* on the ground that their execution was returnable at the wrong place, had issued contrary to stipulation, and was sealed with an old seal, before used ; but he failed in all these grounds. The *fi. fa.* was amended as to the place of return, and the stipulation and seal, being before used, were denied.

In *November* last, *Russ* discovered, for the first time, that no record of any judgment in favour of *C.* & *V.* had ever been filed. Application was accordingly made by *Russ*, at the last *February* term, to vacate the former proceedings, set aside the execution of *C.* & *V.* as having issued without any judgment to support it, and that the moneys paid to them be paid over to *Russ*, on his judgments. On account of a mistake in the title of the papers, the motion was then denied, but renewed again at the last *May* term, whence it

was postponed to the present term, for the purpose of producing additional affidavits.

The attorney of *C. & V.* swore, that he had enclosed a record in their cause, duly signed, with the warrant of attorney to confess judgment, and directed them, by mail, to the Clerk's office of this Court, at *Utica,* in season for their arrival, in the ordinary course of the mail, so as to warrant the *fi. fa.* which he issued; and he supposed that they had been regularly filed till *January,* 1823, when they were returned to him from the General Post-Office, as a dead letter; which fact he concealed till the present motion was noticed.

A motion was also made and continued as above, on the part of *C. & V.,* to amend, by filing the warrant of attorney and record *nunc pro tunc.*

*S. L. Edwards & H. Bleecker,* in support of the motion to vacate the former proceedings, and set aside the execution of *Chichester & Van Wyck,* &c. and against the motion to amend.

The money was ordered to *C. & V.* on the ground that they were judgment creditors. It turns out, in fact, that there was no such ground. The whole was a mere fabrication; and, we believe, the Court have never gone so far as to give the party a judgment *nunc pro tunc,* where he never had one, and not a paper ever reached the proper office. *Russ,* the assignee of the other judgment, would have received the money, if the truth had been known. Saying the least, the whole proceeding was founded in mistake. *Russ* was always legally entitled to this money, and shall *C. & V,* profit by the concealment? An execution issued before the judgment record is filed, is a nullity. (*Barrie* v. *Dana,* 20 John. 307. *Vin. Ab. Judgment, A.* 1, *K. a.*) There can be no doubt that the Court has power to order what we ask under these circumstances. They may order the money refunded, as if the judgment had been reversed by them on error. (2 *Salk.* 587, 588.)

*A. Spencer,* contra. It is said here was no judgment. That we deny. True there was no *judgment docketed,* but the record was signed upon a regular bond and warrant of

attorney.   Filing and docketing does not give the record its validity.   This is derived from the act of signing.   Full notice of this judgment is not denied on the part of *Russ.*   I do not question the physical power of the Court to vacate all these proceedings, but I do deny that it would be a discreet exercise of power, and there is little doubt of the Court's power to amend.   The cases I cite to this point are, *Jackson* v. *Hammond*, (1 *Caines' Rep.* 496) *Seaman* v. *Drake*, (*id.* 9) *People* v. *Burdock*, (3 *id.* 104) *White* v. *Lovejoy*, (3 *John. Rep.* 448) *Close* v. *Gillespy*, (*id.* 526.)   The language of the Court in *Barrie* v. *Dana*, to be sure, is pretty strong in relation to that case ; but it should be confined to the case, which was a *ca. sa.* issued before the record filed, on which the defendant had been imprisoned.   There is a difference, in this respect, between execution against the body, and the mere goods and chattels.   Courts will go very far in amending proceedings which are defective through mistake.   In *Hart* v. *Reynolds*, (not reported) the defendant's real name, in the bond and warrant of attorney, was *John Reynolds*, but all the proceedings, from the *cognovit* to the docket, inclusive, were in the name of *Elisha Reynolds*.   There was, then, no judgment against *John Reynolds* upon the docket, or even in the record, yet a subsequent judgment obtained by *Doe* was denied a preference, on the ground that when he obtained his judgment he had notice of *Hart's*, as a judgment against the real defendant ; and *Hart's* judgment was amended throughout, saving the rights of purchasers who had not notice.   This, too, was a proceeding in relation to real estate.(*a*)

---

(*a*) R. P. HART *against* JOHN REYNOLDS—*August* term, 1817.

IN this cause the facts were briefly that *John Reynolds*, of *Moreau* in *Saratoga* county, had executed to *Richard P. Hart* a bond and warrant of attorney to confess judgment for $10,000, but, by mistake, all the proceedings, including the docket of the judgment, were in the name of *Elisha Reynolds*, defendant.   The papers were filed, and the judgment docketed, *June 6th*, 1811.   Afterwards two judgments were obtained in this Court, and regularly docketed—one in favour of *Walter Doe*, and another in favour of *James Taylor*—previous to which last judgment, and before *Doe's* execution issued, all the personal property of *Reynolds* had been sold up-

*Bleecker*, in reply. None of the cases cited, obviate the objection against an amendment here. The rights of a creditor are in question, who had a regular judgment. None of the cases cited present the question as to creditors, except

on a *fi. fa.* in favour of *Hart*, leaving a considerable balance yet due, which was claimed by *Hart* to be a lien on *Reynolds'* real estate. *Doe* and *Taylor* had actual notice of *Hart's* judgment, and supposed it had been regularly docketed, till after their judgments were perfected. On discovering *Hart's* mistake, they moved to set aside his execution, which was opposed, and a cross motion made to amend, upon the papers introduced for and against the first motion. *J. Reynolds* gave a written consent to the amendment.

The motion was argued by *J. Tallmadge*, for *Doe & Taylor*, and *L. Mitchell* for *Hart*.

*Tallmadge* reasoned, with great ingenuity, against the Court's going the length of *creating* a judgment in the name of *amending* it.

*Mitchell* answered, and his researches extended to the whole law of amendment in relation to this subject. As the result of his argument was adopted by the Court, I think it will be found highly useful and acceptable to the profession.

1. He objected to the motion for setting aside the *execution*, because made by persons *having no right* to make it. The personal property of *Reynolds* was exhausted by *Hart's* execution, before it could be affected either by *Doe's* or *Taylor's* ; and, as to the realty, there is no *necessity* for setting aside the first execution to secure *Taylor* and *Doe* ; for they contend that *they* have the *oldest judgments*. If so, they are safe, whether we sell or not. *Ejectment* is their remedy, and not this motion.

The motion, then, must be rejected, as being officiously *made by strangers, without Reynolds' consent, and against his wishes*.

2 The defects in our judgment, &c. are amendable, and this we may avail ourselves of, on this motion, as it was held in *Seaman* v. *Drake*, (1 *Caines' Rep.* 9) where a motion was made by bail to set aside proceedings, and denied, because the defect was amendable. We move to amend the *judgment* and *proceedings*, and that the judgment be docketed against *John Reynolds, nunc pro tunc*, absolutely as to *Taylor* and *Doe*, who make the present motion, and that the docket shall contain a *saving* of the right of prior purchasers. If the Court think it necessary, we wish that they should reserve the power of modifying the rule as to the other judgment creditors, on their shewing that a particular injury will result to them within (say) three months, as they did in the case of *Wardell* v. *Eden*, (2 *John. Cas.* 126) the rule to be otherwise made *absolute* as to them. No such qualification is *necessary* or *proper*, if it be true that none but *purchasers* can *avail* themselves of the *docket*. At all events, *Taylor's* and *Doe's* judgments should be postponed without any reservation.

that of *Hart* v. *Reynolds*, and there the rights of creditors were saved. The question between these parties depends on their respective diligence. There is no natural equity in the case. There is no difference between the case of real and personal estate, which can affect this question. The

---

This motion for amendment is made by *Hart*, with the cognizance and consent of *Reynolds ;* and the first question which presents, relates to the extent of the power of the Court on applications for amendments.

Where an appeal is made to the equitable side of the Court, the statutes of *Amendments* and *Jeofai's* are thrown out of view, although they control in all cases of amendment after *writ of error brought.* On such applications as the present, the broad rule has been adopted by the Court of B. R. that the Court will amend whenever the ends of justice require it. In *Mara* v. *Quin,* (6 *T. R.* 8) Lord *Kenyon*, Ch. J. says, " The forms of the Court are always best used when they are made subservient to the *justice of the case ;*" and *Ashurst*, J. observes, " It is admitted that amendments have been made, at all times, in order to forward the *justice of the case.*" In that case the Court put the judgment, *forti manu,* two years back, to prevent injustice, because it could not injure third persons. In *The King* v. *The Mayor of Grampond.* (7 *T. R.* 699) Ld. *Kenyon* says, " I wish that that could be attained, that Ld. *Hartwicke*, in the case before him, lamented could not be done, namely, that these amendments were reduced to some certain rules ; but there being no such rule, *each particular case* must be left to the *sound judgment* of the Court. And the best principle seems to be that on which Lord *Hardwicke* relied, in the same case, that an amendment shall or shall not be permitted to be made, as it will best tend to the *furtherance of justice.* Amendments of this kind are not made under the statutes of jeofails, but under the general authority of the Court." In *Seaman* v. *Drake,* (1 *Caines' Rep* 9) the Court allowed the judgment to be signed *nunc pro tunc,* because they said the omission was a neglect of one of their officers, which ought not to prejudice any one. It is to be observed, that by 1 *R. L.* 501, *s* 2, it is enacted, that no judgment shall affect land, &c. as to *purchasers*, &c but from the actual *filing* of the *roll,* after the same *shall have been signed.* Of course, by this statute, subsequent purchasers had acquired a priority of lien ; yet the Court destroyed that priority by an amendment, *nunc pro tunc,* without calling even *purchasers* before them. And the reason was, that they had notice, and supposed there was a valid judgment, to which they expected their lien would be postponed. The amendment could not, therefore, disappoint them, nor work injustice ; but the second incumbrance might well be supposed to have been taken, subject to such amendments in the prior record, as the Court should think fit and proper to direct In *Close* v. *Gillespie,* (3 *John. Rep.* 526) the attorney's name was allowed to be signed to the plea, *nunc pro tunc,* and per *Spencer,* J " I cannot discover any difference, as to the allowing of an amendment, whether the mistake has happened through the omission of an attorney, or by mis-

judgment is a *lien* on the realty, and the execution on the personalty ; but neither can operate if they are void. No execution can issue without a judgment, and the decision in *Barrie* v. *Dana* would have been the same in relation to a *fi. fa.* as it was in relation to the *ca. sa.* The latter may or

take of the Clerk. Both are equally officers of the Court. In the present case, the judgment having been docketed, *Mancius* had. in legal intendment, notice of it. Had error been brought, there might have been more doubt. I cannot perceive that *Mancius*, (the judgment creditor has any right to avail himself of the irregularity which has int rvened ; nor can I perceive that our right to amend, in case of mistake of one of our officers, is to be controlle d by the effect which may be produced in another case. All amendments affect more or less *third persons.*" This opinion ado ts, in their fullest extent, the liberal and humane principles, towards officers of the Court, which prevail in the Court of B. R. and is full to the point, that a judgment creditor, *with notice*, shall not control the power of the Court to amend in cases of *mistake of its officers*, whether clerks or attorneys. The judgment, in that case, was as radically defective and irregular, till amended, as is the judgment in the principal case ; and the Court, by the amendment, created a preference which before did not exist. These cases furnish a conclusive answer to the objection, that the subsequent creditors' supposing there was a valid and legal judgment did not make it so ; and they could not know of the existence of a v lid judgment, when none such; in fact, did exist. In neither of the two last cases was the judgment a valid one.

But the truth is, the *notice* destroyed the equity of the subsequent incumbrancers, and with it the right of objection to an amendment. In *Seaman* v. *Drake*, there was no judgment as to the real estate, so far as purchasers were concerned, until the amendment was made. In the case of *Close* v. *Gillespie*, there was no regular or valid judgment, until the plea was signed, because a void judgment is as *none;* but the Court, in the former case, created a *lien ;* in other words, a *judgment as to the realty*, by relation, because the furtherance of justice made it necessary. In the latter case, a proceeding was validated, which before was nugatory; upon the same principle of equity. In the case of *Mara* v. *Quin*, the Court, by a most extraordinary exertion of its equitable powers, with *strong hand*, allowed the judgment to be signed, filed and docketed, as of a day two years before it was, in fact, obtained, because it advanced the purposes of justice, and the want of notice could not injure third persons. Here we propose that the rights of third persons, purchasers without notice, be expressly saved. In *Mackay* v. *Rhinelander*, (1 *John Cas.* 410) a judgment was entered *nunc pro tunc*, several months before it was, in fact, signed, or filed, or rendered.

One objection is, that *there is nothing to amend by.* To this we answer, it is *impertine t.* It could be proper only on a writ of error—not where an appeal is made to the general authority o the court, with consent of the

UTICA,
Aug. 1824.

Chichester
v.
Cande.

may not affect the party more severely than a *fi. fa.* and is the judgment of the Court to be controlled by such a consideration ?  The gentleman opposed to me, (then Ch. Justice) lays down the rule generally and unqualifiedly in *Barrie* v. *Dana*, that the record must be filed before execution can go,

defendant.  Nothing can prevent the success of such an application, except the immoral tendency of the amendment, the only inquiry being, whether the amendment would contribute to the advancement of justice.  On this principle the Court proceeded, in *Mara* v. *Quin*, in placing the judgment two years earlier on the docket than it was recovered.  ·Yet, I ask, what was there in that case to amend by ?

But there *is* something to amend by, viz. the *warrant of attorney*—the foundation of all the proceedings.  This, according to 1 *R. L.* 4·6, must be filed with the record ; and was, in this case, attached to the proceedings.  It, therefore, identified the defendant, and a judgment may as well be rendered against *John*, by the name of *Elisha*, as he might be arrested by that name, or execute a bond by that name.  A mistake of the name in the judgment may be corrected, provided the real defendant be ascertained in the previous part of the roll, even without the defendant's consent.  (*Cro. Car.* 594.  *Bac. Ab. tit. Amendment*, (*F*).)  The warrant is a part of one entire security, the nature of which is ascertained by the warrant.  Thus, the consideration of a judgment, entered by virtue of a warrant, is the subject of inquiry, on which the Court may award a feigned issue ; but not on a judgment in a contested suit.  This judgment by confession is *sui generis*, the nature of which is ascertained by the warrant.  It is a judgment by *contract*, as contra-distinguished from a judgment by *operation of law*, and will be amended to fulfil the intent of the parties, *ut res magis valeat quam pereat.  Puleston* v. *Warburton*, (1 *Salk.* 48) was, " Ejectment.  Verdict, *pro quer.* wherein he had counted of a demise, the 10*th April*, 1697, instead of 1696, for 97 was not come at the time of the trial ; and the Court agreed, that in a judgment by confession on warrant of attorney, it had and might be amended in ejectment, because without such amendment, the agreement and intent of the parties could not be fulfilled, but denied it in the principal case, because it altered the issue, and made another title." In this case from *Salkield* there was nothing by which to amend the declaration, and the judgment roll, and the *consideratum est*, except the warrant ; yet the Court say all might be amended ; for the judgment being for the *said term*, refers to the declaration, and thus, by altering *one*, the *other* would necessarily be altered.  That amendment, too, would have been made against the will of the defendant.  But, in the principal case, *Hart* has the *consent* of *Reynolds* to every amendment.  Of course, every amendment must be made down to the entry of the judgment.  The case from *Salkield* shews that the declaration may be amended.  No third person has a right to object, till we arrive at the *consideratum est*, &c. and if the previous proceedings be considered as amended, the objection that there is nothing to amend by falls to the ground.

and declares that such has been the practice for 30 years. There is no difference between the different kinds of execution, either in law or common sense.

Suppose a *cap. ad. resp.* sent to a Sheriff, who never receives it, or a letter directing a rule for judgment, to be en-

UTICA,
Aug. 1824.

Chichester
v.
Cande.

The question, then, arises, whether if the other proceedings be right, the *consideratum est. &c* may be altered, so as to become conformable to the previous proceedings, and this question is answered in the affirmative, by numberless authorities. In *Pelham* v. *Henn-ng*, (*Cro. Car.* 594) the marginal note is thus : 'If the name of a party be right in the record, but wrong in the judgment, the judgment may be amended by the record. 'Tis a misprision of the Clerk." In affirmance of the judgment, the judgment itself may be set right, and amended by another part of the record, in a fact which appears to be the misprision of the Clerk, as in the mistake of names of parties. (Vid. *Bac Abr. Amendment*, (*F*), which cites, 1 *Roll. Ab.* 357, and gives, as an example, "*Præductus A*," instead of "*B*," and "*Charles*" instead of "*Robert*.") There is a strong analogy between a security created by *common recovery*, and one given by warrant of attorney. Both are a kind of judicial *lien ;* and there are many instances of amendments in the names of the parties in these common recoveries, as well as in fines Recovery, entered by *A*, *B*, and *C*, but the name of *W* totally omitted, ordered by the Court to be amen ed. For example ; warrant by *V. R.* and *Hesler*—recovery, *W. R.* and *Margaret*, his wife, amended. (*Vin. Abr. Amendment*, *L*).) On an application for such an amendment, it was objected that the heirs at law would be prejudiced, if the *fine* was amended. The Court said they could not take notice, whether it would be a prejudice to the heirs at law or not ; but it was the duty of the Court to *make the fine agreeable to the deed and intention of the parties.* (*id.*)

It will again be objected, that the docket cannot, by law, be amended, for that might be injurious to purchasers and judgment creditors. We answer, the Court have the same power over the docket as over other proceedings, that of making it subserve the *ends of justice.* The rights of purchasers we wish to have saved, either by a *conditional docket*, expressly reserving the rights of prior purchasers and mortgagees, or by enjoining it on *Hart* to release them.

We shall here be told that *judgment creditors* are entitled to the benefit of the statute relative to docketing judgments. The statute, (1 *R. L.* 501) enacts, that no judgment not docketed and entered in the books, &c. shall affect any lands or tenements, as to *purchasers* or *mortgagees*, or have preference against *heirs*, executors, or administrators. *Expressio unius exclusio alterius :* by making the docket necessary as to *purchasers* and *mortgagees*, it is made so *only* as to them. This consideration is the more forcible, when it is recollected that, in the first section of the same act, the legislature have enacted, that no judgment shall continue, for more than

tered, which miscarries, and a thousand other cases arising in our complex system of practice, by which another obtains preference : will the Court relieve against such mistakes ? Will they take away a preference, because accident was against the party who moved first ? Is it enough that a judgment is planned without being perfected ? Where is the

ten years, a *lien* as against *bona fide* purchasers, or subsequent incumbran-cers, y mortgage, *judgment*, or otherwise.

The question, then, again recurs, is a judgment creditor a *purchaser*, within the meaning of this statute? A *purchaser* is one who acquires title otherwise than by descent ; (2 *Bl. Com.* 241) but a judgment creditor has no title to the defendant's real estate. For aught that appears, he may go against the *person* or personal property. Indeed, it has been settled in this state, that a judgment gives no title *per se*. Of course, the judgment creditor can never insist on the docketing clause of the statute. The Court, in considering him as a purchaser, would usurp legislative power. They would assume *jus dare—non jus exponere* .

It will be said, that he may sell the defendant's real estate, and if his judgment be the oldest one docketed, may apply the avails to satisfy it, and vest the title in the purchaser. I answer, in that case the statute would apply, but until a sale no purchaser can intervene ; and, of course, the statute, by the terms of it, can have no application.

The question, then, arises, whether this *possibility* of availing himself of this clause of the statute, is not sufficient to constitute him a purchaser? and this question is emphatically answered in the negative, by the decision in *Jackson* v. *Dubois.* (4 *John. Rep.* 216.) It was there decided that a mortgage not registered, has a preference over a subsequent judgment docketed. The clause in 1 *R. L.* 373, respecting mortgages, coincides with that on the subject of docketing judgments. It is this : " No mortgage, nor any deed, conveyance or writing, in the nature of a mortgage, shall defeat or prejudice the title or interest of any *bona fide purchaser* of any lands, tenements, or hereditaments, unless the same shall have been duly registered as aforesaid." The language in the two statutes is so nearly the same, that the decision last cited may be considered in point to shew, that until a sale under the judgment first docketed, the prior docketing creates no preference, and the statute has no application. His honour Judge *Spencer*, in delivering the opinion of the Court, says—" Before this statute, there was no necessity of registering mortgages. They would have stood upon the same footing as any other lien on real property. Since the statute, they must be registered, or lose their priority as to junior mortgages, and be liable to be defeated, in case of a *bona fide purchase* prior to the registry. There is nothing in the statute which gives a preference to a judgment docketed, over an unregistered mortgage. Should the mortgagee permit a sale to take place prior to the registry, then, in my opinion, the ver-

discretion of this Court, arising upon questions of diligence, to end ? We have gained a legal preference, and are entitled to retain it.

WOODWORTH, J. delivered the opinion of the Court. He went much at large into the facts of the case, which were

dee of the Sheriff would be protected from the mortgage, and it would lose its priority.

After this decision, it may be said, with the utmost confidence, that the present case stands on the same footing as it would before the statute relative to dockets ; and there cannot be a doubt that, before the statute, this judgment of *Hart* would have been a lien on *John Reynolds'* estate ; and the Court, to give effect to the intent and agreement of the parties, would have ordered an amendment, precisely as a Court of Equity would have ordered a mistake in a mortgage to be corrected, as against a mortgagor, and all persons who bought with notice of the defective mortgage.

Here it appeared from the records of the Court, so that the fact could not be misunderstood, that by the *agreement* of *John Reynolds, Hart's* debt was to be secured by a judgment against his real estate, and such judgment was actually given, though informally. To say that the judgment is not against *John*, is puerile sophistry. It is a judgment against him, though not by his right name. This objection would, on the principle of our opponents, always prevent an alteration in the name of a party, in a *conveyance*, or *fine*, or a *recovery*, or a *judgment*. But the books teem with amendments in every one of these cases. Of the records of the Court all persons were bound, before the statute, to take notice, even executors and administrators, to determine the priority of debts. (6 *T. R.* 1.) So it is said, in *Tidd*, 860, that, before the statute, the defendant's lands were held from the time of the judgment, but *since*, the docketing is necessary as to *purchasers* and *mortgagees*. If this Court can direct the signing of a judgment *nunc pro tunc*, so as to perfect the oldest judgment, though radically defective, they certainly may supply any other deficiency ; for a judgment *not signed* is, as to the *real estate*, a nullity so far forth as purchasers are concerned. To supply the signing *nunc pro tunc*, makes the judgment, as to all, different from what it was before signing. Thus, if the christian name of either party were altered, it renders that operative which before was void. As to the lien upon real property, the Court create a new judgment, as much in one case as in the other.

The truth is, that every alteration makes the judgment a *new* one ; *i. e.* it makes it *different* from what it was before the alteration ; and the futile argument, that " if the party knew of *Hart's* judgment, yet that the *scienter* did not make it a valid one, and that he must be supposed to have known it to be defective," would prevent every amendment. It might have been urged, with the same force, in the case of *Seaman* v. *Drake*, where the judgment was not signed, as in this case. If the judgment had been perfect, no amendment would have been necessary. Every application for

scattered through a great variety of papers, and gave the opinion of the Court on several minor points, which I have not deemed it material to notice. He then spoke to the principal points nearly as follows:

We have considered this case as deliberately and fully as we think its importance and novelty require ; and we are

an amendment supposes the judgment to be defective.    The distinction between a judgment creditor and a purchaser, is not only founded on the *language* of the statute, but in *good sense;* for the lien of a purchaser is specifick.    The money is advanced upon the *title* and credit of the estate, but that of a judgment creditor is *general.*    He may go against the *person.* So in *Tidd,* 851, "If one article to buy an estate, and pay the purchase money, and afterwards a judgment is recovered against the vendor by a third person, who had *no notice,* yet this judgment shall not, in Equity, affect the estate.    But a mortgagee, &c. shall hold place against the covenantee ; for, in this case, the money is lent upon the *title* and *credit* of the estate, and attaches upon the land ; but a judgment is only a *general security*—not a specific lien upon the land."    So, in 2 *Vesey,* 662, per Ld. Chancellor, "A prior mortgagee, having a subsequent judgment, may tack the judgment to the mortgage, but a prior judgment creditor, getting a subsequent mortgage, cannot do it, because the judgment is not a specific lien upon the land ; that is, he does not go on the security—he has not trusted to the credit of the estate."

It is again to be observed, in this case, that the creditors had *notice* of *Hart's* judgment, when they took their own.    The object of a docket is to give notice to purchasers, as much as it is the object of *registering* a mortgage.    There is not the least shade of distinction.    *Actual* notice, then, supersedes the necessity of a docket, certainly as respects judgment creditors, who are not named in the docketing statute, and it is sufficient, in case of a mortgagee, that he had notice at the time of taking his mortgage.    By the notice the object of the act is answered, and taking the deed or lien, under such circumstances, is a *fraud.*    This doctrine is fully canvassed in *Jackson* v. *Burgott,* (10 *John.* 461) where the late Ch. J. *Kent* says, "It may be assumed, as a settled principle in the English law, that where a subsequent purchaser, whose deed is registered, *had notice, at the time of his purchase,* of a prior unregistered deed, the prior deed shall have preference.    The purchase, under such circumstances, is a fraud.    It is considered as done *mala fide,* by assisting the original vendor to defraud the prior vendee ; and the Courts will not suffer a statute, made to prevent fraud, to be a protection to fraud.    The foundation of the English doctrine is, the fraud of the 2d purchase, under a *knowledge* of the first.    An unregistered deed is in no case *void.*    It is always good as against the grantor and his heirs."    He continues, "When the statute says that every deed not recorded shall be adjudged fraudulent and void, against a subsequent pur-

satisfied that the respective applications of these parties are addressed to the sound discretion of the Court. We do not forget that we are bound by decisions, as far as they can be made to apply to such a case ; but we do not find ourselves tied down by these to any particular course of proceeding. The whole tenor and scope of the cases appear to call for a

chaser for valuable consideration, whose deed shall be recorded, it undoubt-edly meant a subsequent purchaser in *good faith*. A subsequent purchaser *mala fide* was not within the purview of the act. Consequently, in the case of a second purchaser, *with notice*, no estate passes to him by the deed." The whole of this opinion is worthy of particular attention, and, " *mutatis mutandis*," applies with peculiar force to a subsequent judgment creditor with *notice* of a former *lien*.

The moment such a creditor attempts to wrest from the older incum-brancer his security, he himself becomes an incumbrancer *mala fide*. In such case, no *lien* passes to him by the 2d judgment. It is urged by the opposite counsel, that when the credit was given, the subsequent judgment creditors had received no notice ; and, therefore, they are purchasers with-in the docketing statute. This notion is too absurd to require refutation. The credit was not given on the defendant's land. The creditors do not pretend to have examined the records before credit given, " *qui tacet con-sentire videtur*." *Taylor* admitted that he did not examine them. It ap-pears from *Reynolds'* affidavit that he told both *Taylor* and *Doe*, at the time of executing their bonds and warrants, of the existence of *Hart's* judg-ment. *Taylor* admitted to *Mitchell* that he knew of *Hart's* judgment and execution when he took his own. *Doe*, in his affidavit, admits that he knew of *Hart's* judgment when *Hart's* execution issued, viz. the 28*th* of *July*, whereas the judgment in favour of *Doe* was filed the 5*th* of *August*, and *Doe* stated that he knew of no irregularity in *Hart's* judgment until *September*. Suppose *A* takes a mortgage, but does not have it registered, and *B* lends money on a note of the mortgagor, without notice of the mortgage, and afterwards, after *A's* mortgage is registered, *B* takes anoth-er mortgage, it would be ludicrous for him to claim priority, as a *purcha-ser*, because when he advanced the money on a note he knew not of *A's* mortgage. Suppose in the case now before the Court, on an application for an amendment, there appeared to be no judgment creditors, nor any one to oppose, except a grocer, who had credited *Reynolds* a few shillings ; and suppose he should allege, that he would not have trusted him if he had known of *Hart's* judgment: would such opposition avail any thing ? or could he be considered, in any sense, as a purchaser ? It is suffi-cient, in the case of a deed or mortgage, that the subsequent grantee or mortgagee had notice *when he took his deed or mortgage*. By taking it he does an act against conscience ; *i. e.* if it is ever applied to destroy an older lien. (9 *John.* 168.)

very extensive exercise of discretion in the amendment of proceedings conducted in good faith, by filling the chasms which may have intervened through accident or mistake ; especially in a case where the person whose rights are to be affected has had full information that the proceedings are perfect, and has gone on under the idea that they were so.

The present is an appeal to the *equitable powers of the Court*. Of course they ought to give *such relief as a Court of Equity* would give in this or similar cases. Suppose *A* contracts to sell to *B*, and he afterwards sells to *C*. *B* files a bill to compel specifick performance, charging *C* with collusion—*C* must, in his answer, not only make out that he is a fair *bona fide* purchaser, for a valuable consideration, but also that this was without notice of *B's* interest. Here *Hart* applies for the specifick lien intended, and agreed to be given. No one can prevent the equitable interference of the Court but a purchaser, and that without notice. *Doe* and *Taylor* are neither of them *purchasers*, and they both had *notice*.

Again : a *defective security* will be enforced in Equity, against creditors who have only a *general*—not a *specifick* lien ; as *judgment* creditors. In *Taylor* v. *Wheeler*, (2 Sa'k. 449) a copy holder in fee surrendered to the use of the mortgagee in fee, and became bankrupt before presentment, and there never was any presentment made, and the question was, whether the assignees of the commissioners of bankruptcy, or the mortgagee, should be preferred ; and per Ld. Chancellor, " Though the surrender was *void in law*, for want of a *presentment*, and that might be the *laches* of the mortgagee, in not procuring it, yet the surrender was a *lien*, and bound the land in equity, and the assignee ought not to be in a better case than the bankrupt, who was plainly bound, in equity, by this defective conveyance. It was amended, as appears by 2 *Vernon*, 564, S. C. On the same principle, there cannot be a doubt but a Court of Equity would order this judgment docketed *nunc pro tunc*, as against all but *bona fide* purchasers. The opposition of a judgment creditor could not prevent it. More especially, when it appeared that he took his incumbrance with notice of the defective one, a Court of Chancery would refuse to listen to his objection for a moment. If Chancery would give the relief sought, will this Court drive us to the enormous expense of applying to that Court for relief, which this Court has equal power to give ? It appears from the cases cited, (6 *T. R.* 8, and 7 *T. R.* 699) that this Court can do whatever the ends of justice require in regard to amending their records

That the 2d judgment creditor knew of the older judgment at the time of obtaining his own—that he has equal equity with the first, while attempting to defeat the prior one, and wrest from the oldest creditor his security, is a doctrine which would be scouted from a Court of Equity.

As to the case of *Sale* v. *Crompton*, (1 *Wils.* 61) and *Wentworth* v. *Stafford*, (*Ld. Raym.* 68) cited on the other side, against an amendment, they both proceed on the ground that an amendment would be injurious to

We feel less delicacy in going for this purpose to the utmost limit of our power, when it is plain that no one can suffer from its exercise. The amendment of proceedings must, in a great measure, rest upon this consideration.

Here is not a struggle in relation to the avails of a freehold estate, the disposition of which might be controlled by

purchasers. The judgments, in both cases, were old ones; the purchasers could not be ascertained; nor was any offer made to release them, or have their rights saved. In the case now before the Court, *Reynolds* swears there are but three purchasers, and those *Hart* offers to release, or to have their rights and those of all other possible purchasers, saved by a conditional docket. In *Bacon's Abr. Amendment*, (*F*) also cited on the other side, it is conceded, that if the rights of purchasers did not come in question, the judgment might be amended to any extent.

Neither can it be said that a judgment not docketed is not a lien; for the case of *Seaman* v. *Drake* shews the incorrectness of such a position. In that case the judgment was not signed, and, therefore, had no lien as to purchasers; yet the Court allowed it to be amended, as well as to purchasers as judgment creditors. The truth is, a judgment not docketed is a *lien*. It was so at common law, and in *Seaman* v. *Drake* the Court created a lien where none before existed. In the case cited from 2 *Vernon*, 564, Chancery made good a totally void surrender, stating that though void, yet it was a lien as between the parties, and the assignees were only *general* creditors, and had not a specifick lien, as mortgagees have. So, in this case, *our judgment* was a lien; Equity would compel the defendant to comply with his agreement, and the resistance of those creditors who knew of *Hart's* judgment is *unconscientious, dishonest* and *fraudulent*. In asking that the judgment be amended, as to *Taylor* and *Doe*, we request nothing unreasonable or improper. As to the other judgment creditors, not now before the Court, we are not very anxious that the Court should interfere.

*The Court* directed the following RULE :—

*August 22d*, 1817.

(*After the title of the cause.*)

A motion having been made on behalf of *Walter Doe* and *James Taylor*, judgment creditors of *John Reynolds*, to set aside the execution issued to the Sheriff of *Saratoga* county, in the above cause, on the grounds specified in the notice of said motion, and a cross-motion having been made by *Richard P. Hart*, to amend the record of judgment and proceedings connected with such record, filed the 6*th* day of *June*, one thousand eight hundred and eleven, in favour of *Richard P. Hart* against *Elisha Reynolds*, entered and filed by virtue of a warrant of attorney attached to said record, executed by *John Reynolds*, and also the docket of said judgment and the entry of the time of signing said record *nunc pro tunc*, on the grounds

the priority of the *judgments*, which are in themselves liens upon that kind of property ; but it relates to the personalty, which is bound by an execution alone. A knowledge that there was or was not a judgment in existence, could in no way be material to *Russ*, or the creditor who assigned to him, for the reason that a judgment, *per se*, could not affect their rights. The important facts in relation to this case were perfectly understood by all the parties in interest, as early as *May* term, 1822, when the subject was before this Court upon a disclosure of those facts. The money now in question was

set forth in the affidavits on which said cross-motion is founded :. On reading and filing the affidavits read in this cause, ORDERED, on motion of Mr. *Mitchell*, counsel for *Richard P. Hart*, that the motion to set aside said execution be denied, upon the payment of the costs of the motion to set the same aside, by the said *Richard P Hart*. It is further ordered, by and with the consent of *John Reynolds*, that the judgment record and proceedings connected with such record, filed the 6th day of *June*, one thousand eight hundred and eleven, in favour of *Richard P. Hart* against *Elisha Reynolds*, entered and filed by virtue of a warrant of attorney attached to said record, executed by *John Reynolds*, for ten thousand dollars, be amended, by inserting the name of *John Reynolds* instead of *Elisha Reynolds*, as often as the latter occurs in said record of judgment and such proceedings and that the book of dockets, as far as it relates to said judgment, be altered, so as to conform to the amended judgment as to the defendant's name and the amount of the judgment, and that the day of signing said judgment be altered to the day when it was docketed, and that said amendments be made *nunc pro tunc*, so that the said judgment shall be, in all respects, a perfect judgment for ten thousand dollars, against *John Reynolds*, entered, signed, filed, docketed and inserted, in the book of dockets, the said 6th day of *June*, one thousand eight hundred and eleven : Provided, that the Clerk shall express in the said book of dockets, opposite said defendant's name, where said judgment is docketed therein, that the rights of *bona fide* purchasers from, and mortgagees of said *John Reynolds*, between the 6th of *June*, one thousand eight hundred and eleven, and the day of entering this rule, shall not be prejudiced by such alteration of said books of dockets, and provided a copy of this rule be attached to the said record. It is further ordered, that a copy of this rule be served on each of the judgment creditors of *John Reynolds*, whose lien accrued before this day, within *six weeks* from this time. It is understood, however, that this Court will make such order the next term of this Court as shall be just, in relation to the judgment in this cause, as to all judgment creditors of the said *John Reynolds*, whose lien accrued before the day of entering this rule, except *Walter Doe* and *James Taylor*, provided application be duly made therefor, the next term of this Court, and not afterwards.

awarded to *Chichester* & *Van Wyck*, and the rights of the parties fully settled. Now here is nothing in *fieri*. The various executions were levied—a sale made under the direction of the Court—the avails paid into Court, to abide our order, which awarded the money to *Chichester* & *Van Wyck*—and that money has been actually paid. The order of the Court has been executed. It is, at least, doubtful, on this ground alone, whether we have power to disturb the dispositions which have been made—whether this money has not passed beyond the bounds of our summary jurisdiction. It is true that a matter once passed upon, in this way, is not deemed technically *res judicata*. It may be opened. We will hear it again, upon good cause being shewn ; but where the order made has been carried into full execution, and the party has gone off with the avails in his pocket, it is deserving of great consideration, at least, whether we can bring him back into Court upon motion, and dictate the course he shall take, whatever additional light may be thrown around the subject ; and this, in a special manner, where all has gone forward in good faith. Take the case of a motion to enter satisfaction upon the judgment roll, on the ground that the money has been paid : the defendant swears to the payment, which the plaintiff as solemnly denies : the case being balanced, the motion is denied. At another term, the defendant renews his application, upon the ground that he has since discovered a release, or receipt of the plaintiff, acknowledging that he had received the money. We might hear the application, and grant the necessary relief, provided the judgment yet remained *in fieri ;* but suppose, in the mean time, that the money had been paid to, and pocketed by the plaintiff, I should doubt the power of the Court to afford redress in this manner. The suit is at an end, and the whole becomes a matter *in pais.* So of a motion for a new trial, on the ground that undiscovered evidence was behind, which is refused ; and the judgment perfected and execution had ; a second application would hardly be received, under such circumstances, however strong the appeal. There is a point at which these summary applications should cease, like every other litigation, for the sake of certainty and social quiet.

UTICA,
Aug. 1824.

Chichester
v.
Cande:

But there is a precedent which is very direct to bear us out in amending this proceeding on the part of *Chichester & Van Wyck*, even were the money now in the hands of the Clerk. I allude to the case of *Close v. Gillespy*, (3 *John. Rep.* 526.) A judgment had been signed and docketed upon a warrant of attorney ; but, through mistake, the name of the defendant's attorney was neither subscribed to the *cognovit* nor inserted in the roll. *Mancius*, having obtained a subsequent judgment against the defendant, a motion was made by the plaintiff to amend the proceedings *nunc pro tunc*. Now that record was invalid. Both parties considered it so ; and the application was opposed because the rights of *Mancius* were to be affected by the amendment. Executions on both judgments had been delivered to the Sheriff, the execution of *Close* being first delivered, and both he and *Mancius* claimed a preference ; yet *Close* was allowed to amend, though both executions were levied on the same property. The Judge who gave the opinion of the Court, declares broadly, (and in this he is sustained by all the authorities) " I cannot perceive that our right to amend, in case of the mistake of one of our officers, is to be controlled by the effect which is to be produced in another case. All amendments affect, more or less, third persons." That case is much in point ; and, indeed, appears to me precisely parallel in principle with the one before us, the application for an amendment in which comes strongly commended to us by the principles of justice. *Chichester & Van Wyck* had a judgment and execution, perfect in every particular, as it respects personal property, except in the mere formality of filing in the Clerk's office. Instead of being answered by a constructive docket-notice, which was deemed sufficient for the junior creditor in *Close v. Gillespy*, *Russ* had actual notice, in the most explicit manner, by an execution and levy. We leave him in possession of all the rights upon which he could ever calculate, in legal propriety, without granting his motion. This must be denied ; and *Chichester & Van Wyck* must take the effect of their motion to amend.

SUTHERLAND, J. It is, perhaps, proper to add, that in forming the opinion which has been delivered, we must not

be understood as questioning the case of *Barrie* v. *Dana*, or as doubting that, in all cases, the roll should be filed before execution can issue. We have been governed much by the peculiar circumstances attending this particular case. The subsequent creditor knew of the judgment, and relied solely on technical ground to defeat it. We hear no complaints from the party defendant.

Rule accordingly.